# 23-7612

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

SALAMON GIMPEL, ROSEWOOD FUNERAL HOME,

*Lead Plaintiffs-Appellants,*

JAMES SPADOLA, RODNEY LYNN,

*Consolidated Plaintiffs,*

BRADLEY D. FLORA, Individually and
on behalf of all others similarly situated,

*Plaintiff,*

—against—

THE HAIN CELESTIAL GROUP, INC., IRWIN D. SIMON, PASQUALE CONTE, JOHN
CARROLL, STEPHEN J. SMITH,

*Defendants-Appellees.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANTS-APPELLEES

JOHN M. HILLEBRECHT
MARC A. SILVERMAN
DLA PIPER LLP (US)
1251 Avenue of the Americas
New York, New York 10020
(212) 335-4590

*Attorneys for Defendants-Appellees*

## <u>DISCLOSURE STATEMENT</u>

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Defendant-Appellee The Hain Celestial Group, Inc., by and through its undersigned counsel, hereby certifies that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

*/s/ John M. Hillebrecht*
John M. Hillebrecht
Marc A. Silverman
**DLA PIPER LLP (US)**
*Attorneys for Defendants-Appellees*
1251 Avenue of the Americas
New York, NY 10020
212.335.4500
john.hillebrecht@us.dlapiper.com
marc.silverman@us.dlapiper.com

# **TABLE OF CONTENTS**

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............................1

STATEMENT OF THE CASE...............................................................1

    A.    Background ...............................................................1

    B.    The SAC's Allegations .............................................5

    C.    Procedural History.................................................7

SUMMARY OF ARGUMENT .............................................................9

ARGUMENT ...............................................................................11

I.    THE DISTRICT COURT PROPERLY FOUND THAT APPELLANTS FAILED TO ALLEGE SCIENTER ....................................................11

    A.    The District Court Correctly Found that Appellants Failed to Plead "Motive and Opportunity" ..........................................12

        1.    The Stock Sales Do Not Support a Motive to Commit Fraud...............13

        2.    Bonuses Do Not Support Scienter ..........................................17

    B.    The District Court Correctly Found that Appellants Failed to Plead "Conscious Misbehavior or Recklessness"................................19

        1.    The District Court Properly Found that the Allegations Regarding "Active Participation in" Purported "Unsustainable Sales Practices" Do Not Support a Strong Inference of Scienter............................................19

        2.    SOX, GAAP, and Internal Controls Violations Do Not Support Scienter ................................................................30

        3.    The Employment Status Changes Do Not Support Scienter.................32

        4.    The "Core Operations" Theory Does Not Support Scienter .................34

        5.    Hain's Sales to UNFI Do Not Support Scienter ....................................36

        6.    Hain's Remedial Measures Do Not Support Scienter ...........................38

    C.    The District Court Expressly Considered the Scienter Allegations Holistically ................................................................38

II.    THE DISTRICT COURT CORRECTLY FOUND THERE CAN BE NO CONTROL PERSON LIABILITY .............................................................41

ii

III.    THE DISTRICT COURT CORRECTLY FOUND THAT THIS ACTION SHOULD BE DISMISSED WITH PREJUDICE ..........................................42

IV.    IN THE ALTERNATIVE, THE COURT SHOULD AFFIRM BASED ON THE HOLDING BELOW THAT THE CHALLENGED STATEMENTS ARE INACTIONABLE ................................................................46

  A.    Allegations Related to "Unsustainable" Practices Fail.............................47

    1.    The SAC Fails to Plead an Absolute Right of Return that Generated Sales as Alleged ................................................................48

    2.    The SAC Fails to Plead that Sales Incentives and Promotions to Generate Sales Were Not Disclosed .......................................50

  B.    The Statements Regarding Accounting Controls Are Not Actionable ......52

  C.    Appellants Abandoned Claims Concerning Hain's Financial Results and Related Accounting Practices ..................................................55

V.    ADDITIONAL ISSUES NOT REACHED BY THE DISTRICT COURT WARRANT DISMISSAL ................................................................56

CONCLUSION ................................................................57

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abramson v. Newlink Genetics Corp.*,
965 F.3d 165 (2d Cir. 2020) ................................................................53

*Acito v. IMCERA Grp., Inc.*,
47 F.3d 47 (2d Cir. 1995) ...................................................................11

*In re AIG Advisor Grp. Sec. Litig.*,
309 F. App'x 495 (2d Cir. 2009) ...........................................51, 52, 55

*Altayyar v. Etsy, Inc.*,
242 F. Supp. 3d 161 (E.D.N.Y. 2017), *aff'd*, 731 F. App'x 35 (2d
Cir. 2018) ............................................................................................21

*In re Avon Sec. Litig.*,
2019 WL 6115349 (S.D.N.Y. 2019)....................................................25

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
566 F. App'x 93 (2d Cir. 2014) ..........................................................51

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
763 F. Supp. 2d 423 (S.D.N.Y. 2011) .................................................36

*Bd. of Trustees of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v.
Mechel OAO*,
811 F. Supp. 2d 853 (S.D.N.Y. 2011), *aff'd sub nom. Frederick v.
Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012) ................................46

*In re Bristol-Myers Squibb Co. CVR Sec. Litig.*,
658 F. Supp. 3d 220 (S.D.N.Y. 2023) .................................................36

*In re Bristol-Myers Squibb Sec. Litig.*,
312 F. Supp. 2d 549 (S.D.N.Y. 2004) .............................16, 21, 31, 56

*Caiafa v. Sea Containers Ltd.*,
525 F. Supp. 2d 398 (S.D.N.Y. 2007) .................................................56

iv

*In re Carter-Wallace, Inc., Sec. Litig.*,
220 F.3d 36 (2d Cir. 2000) ....................................................................31

*Chapman v. Mueller Water Prods., Inc.*,
466 F. Supp. 3d 382 (S.D.N.Y. 2020) ...............................................15

*In re China Organic Sec. Litig.*,
2013 WL 5434637 (S.D.N.Y. 2013)......................................................31

*City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v.*
*Nat'l Gen. Holdings Corp.*,
2021 WL 212337 (S.D.N.Y. 2021), *aff'd*, 2021 WL 5142702 (2d
Cir. 2021) ...............................................................................................14

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
450 F. Supp. 3d 379 (S.D.N.Y. 2020) .................................................13

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
752 F.3d 173 (2d Cir. 2014) ...........................................................43, 45

*City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't*
*Inc.*,
477 F. Supp. 3d 123 (S.D.N.Y. 2020) .................................................25

*In re Coty Inc. Sec. Litig.*,
2016 WL 1271065 (S.D.N.Y. 2010)...............................................23, 50

*Dalberth v. Xerox Corp.*,
766 F.3d 172 (2d Cir. 2014) ...............................................................55

*Das v. Rio Tinto PLC*,
332 F. Supp. 3d 786 (S.D.N.Y. 2018) .................................................38

*In re Diebold Nixdorf, Inc., Sec. Litig.*,
2021 WL 1226627 (S.D.N.Y. 2021).................................................12, 40

*Doubleline Capital LP v. Odebrecht Fin., Ltd.*,
323 F. Supp. 3d 393 (S.D.N.Y. 2018) .................................................55

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005)..............................................................................11

*ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
 553 F.3d 187 (2d Cir. 2009) ...................................................12, 18, 29

*Francisco v. Abengoa, S.A.*,
 624 F. Supp. 3d 365 (S.D.N.Y. 2022) ...............................................17

*Francisco v. Abengoa, S.A.*,
 481 F. Supp. 3d 179 (S.D.N.Y. 2020) ...............................................23

*Fries v. N. Oil & Gas, Inc.*,
 285 F. Supp. 3d 706 (S.D.N.Y. 2018) ...............................................16

*Gamm v. Sanderson Farms, Inc.*,
 944 F.3d 455 (2d Cir. 2019) .............................................................29

*Ganino v. Citizens Utils. Co.*,
 228 F.3d 154 (2d Cir. 2000) .............................................................51

*Garland v. New York City Fire Dep't*,
 2024 WL 445001 (2d Cir. 2024) ......................................................42

*Gauquie v. Albany Molecular Res., Inc.*,
 2016 WL 4007591 (E.D.N.Y. 2016) ...........................................36, 37

*Gavish v. Revlon, Inc.*,
 2004 WL 2210269 (S.D.N.Y. 2004).................................................21

*Glaser v. The9, Ltd.*,
 772 F. Supp. 2d 573 (S.D.N.Y. 2011) ...............................................13

*Gluck v. Hecla Mining Co.*,
 657 F. Supp. 3d 471 (S.D.N.Y. 2023) ...........................................21, 55

*Grace v. Rosenstock*,
 228 F.3d 40 (2d Cir. 2000) ...............................................................42

*In re Hain Celestial Grp., Inc. Sec. Litig.*,
 20 F.4th 131 (2d Cir. 2021) ......................................................*passim*

*Hutchison v. Deutsche Bank Sec. Inc.*,
 647 F.3d 479 (2d Cir. 2011) .............................................................42

vi

*In re IAC/InterActiveCorp Sec. Litig.*,
  695 F. Supp. 2d. 109 (S.D.N.Y. 2010) ...............................................23

*In re Iconix Brand Grp., Inc.*,
  2017 WL 4898228 (S.D.N.Y. 2017).......................................................38

*Iowa Pub. Emp's. Ret. Sys.*,
  919 F. Supp. 2d 321 (S.D.N.Y. 2013) ..................................................31

*Janbay v. Canadian Solar*,
  2013 WL 1287326 (S.D.N.Y. 2013), *aff'd* (2013) ...............................25

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001) ..................................................12, 19, 23

*Kleinman v. Elan Corp., plc*,
  706 F.3d 145 (2d Cir. 2013) ................................................................29

*Lachman v. Revlon, Inc.*,
  487 F. Supp. 3d 111 (E.D.N.Y. 2020) .................................................53

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015) ...........................................................44, 45

*Maloney v. Ollie's Bargain Outlet Holdings*,
  518 F. Supp. 3d 772 (S.D.N.Y. 2021) .................................................17

*McCarthy v. Dun & Bradstreet Corp.*,
  482 F.3d 184 (2d Cir. 2007) ................................................................42

*Meyer v. Jinkosolar Holdings Co.*,
  761 F.3d 245 (2d Cir. 2014) ................................................................54

*New Orleans Emps. Ret. Sys. v. Celestica, Inc.*,
  455 F. App'x 10 (2d Cir. 2011) ...........................................................25

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000) ..................................................18, 19, 23

*Olson v. Major League Baseball*,
  29 F.4th 59 (2d Cir. 2022) ..............................................................47, 56

*In re OSG Sec. Litig.*,
    12 F. Supp. 3d 622 (S.D.N.Y. 2014) ....................................32

*Palacio v. City of New York*,
    489 F. Supp. 2d 335 (S.D.N.Y. 2007) .................................46

*Paleja v. KP NY Operations LLC*,
    2022 WL 364007 (2d Cir. 2022) .........................................45

*Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*,
    939 F. Supp. 2d 445, 453 (S.D.N.Y. 2013) .......................55

*Porat v. Lincoln Towers Cmty. Ass'n*,
    464 F.3d 274 (2d Cir. 2006) ...............................................45

*Presbyterian Healthcare Servs. v. Goldman Sachs & Co.*,
    2017 WL 1048088 (S.D.N.Y. 2017)..............................29, 30

*Price v. Strianese*,
    2017 WL 4466614 (S.D.N.Y. 2017)....................................29

*Ressler v. Liz Claiborne, Inc.*,
    75 F. Supp. 2d 43 (S.D.N.Y. 1998) ...................................16

*Rotunno v. Wood*,
    2022 WL 14997930 (2d Cir. 2022) ...............16, 29, 30, 31

*S.E.C. v. Espuelas*,
    698 F. Supp. 2d 415 (S.D.N.Y. 2010) ...............................21

*SEC v. Price Waterhouse*,
    797 F. Supp. 1217 (S.D.N.Y. 1992) ..................................31

*In re Salix Pharms., Ltd.*,
    2016 WL 1629341 (S.D.N.Y. 2016)..........................*passim*

*San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*,
    75 F.3d 801 (2d Cir. 1996) .................................................17

*Schiro v. Cemex, S.A.B. de C.V.*,
    396 F. Supp. 3d 283 (S.D.N.Y. 2019) ...............................23

*In re Scholastic Corp. Sec. Litig.*,
    252 F.3d 63 (2d Cir. 2001) ............................................................13, 20

*Slayton v. Am. Exp. Co.*,
    604 F.3d 758 (2d Cir. 2010) ...................................................................38

*Snowbridge Advisors LLC v. Soho Square Cap. LLP*,
    2023 WL 8368630 (2d Cir. 2023) .........................................................13

*S. Cherry St., LLC v. Hennessee Grp. LLC*,
    573 F.3d 98, 109 (2d Cir. 2009) ...........................................................17

*SRM Glob. Master Fund Ltd. P'ship v. Bear Stearns Cos.*,
    829 F.3d 173 (2d Cir. 2016) ...................................................................41

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)................................................................................11

*In re Wachovia Equity Sec. Litig.*,
    753 F. Supp. 2d 326 (S.D.N.Y. 2011) ...................................................23

*Wilbush v. Ambac Fin. Grp., Inc.*,
    271 F. Supp. 3d 473, 499 (S.D.N.Y. 2017) ...................................33, 34

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) .................................................................28

**Statutes**

Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u–4 .......11, 35, 48

**Other Authorities**

Fed. R. Civ. P. 9(b) ........................................................................11, 48

Rule 10b-5, 17 C.F.R. § 240.10b–5 ................................................7, 8, 51

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.  Whether the District Court properly found that Appellants failed to allege a strong inference of scienter, considering the allegations collectively and weighing the competing inferences.

2.  Whether the District Court properly found, after Appellants already had three previous opportunities to amend their Complaint and presented no new facts supporting any further amendment, that the action should be dismissed with prejudice.

3.  If this Court chooses to address the issues not reached by the District Court, whether dismissal with prejudice should be affirmed on the alternative grounds that the allegedly misleading statements are not actionable (because they constitute puffery or otherwise) and/or because Appellants fail to establish the elements of loss causation and materiality.

## STATEMENT OF THE CASE

### A.     Background

Hain Celestial Group, Inc., a Delaware corporation, was founded in 1993. The Company manufactures, markets, distributes, and sells organic and natural products under brand names that are sold as "better-for-you" products. Hain Celestial is a leader in many organic and natural products categories and sells its products through

specialty and natural food distributors, supermarkets, natural food stores, and convenience stores in over 80 countries worldwide.

In its August 2016 Form 8-K, Hain announced that it was evaluating whether the revenue associated with certain sales incentives "was accounted for in the correct period and [was] also currently evaluating its internal control over financial reporting." (JA-371). Hain further stated that its Audit Committee was "conducting an independent review of these matters." (JA-371). Two days later, the Appellants sued.

The Audit Committee's internal investigation consisted of independent counsel—in coordination with independent auditors—reviewing over 700,000 emails and custodial documents, interviewing more than 30 relevant personnel, and conducting a forensic accounting analysis. On November 16, 2016, Hain announced that the Audit Committee had completed its investigation and found "no evidence of intentional wrongdoing in connection with [Hain]'s financial statements." (JA-284).

On June 22, 2017, Hain announced that its internal accounting review had "concluded there was no evidence of intentional wrongdoing in connection with the preparation of the Company's financial statements." (JA-384 (Form 8-K at 5); JA-284). Hain "identified certain immaterial errors relating to its previously-issued financial statements which resulted in revisions to its previously-issued financial statements." (JA-384). These "immaterial" changes "had no effect on the validity

2

of the underlying transactions" (JA-384; *cf.* JA-363 (SEC Order ¶ 20); JA-302–03)

and "had no impact on cash flows or cash balances" (JA-384). Hain's auditor

"maintained its previously issued opinion with respect to the financial results for the

[relevant periods]." (JA-384).

In its accompanying Form 10-K, Hain explained that its accounting review

had focused on, among other things, concessions to distributors, payment terms,

rights of return, and Hain's policy to record revenue when the product transfers to

the distributor. The review had concluded that Hain's "***historical accounting policy***

***for these distributors is appropriate***." (JA-481 (emphasis added)). Hain also

disclosed that its sales and accounting practices caused only immaterial errors

relating to the "timing of customer payments and incentives associated with trade

promotions." (JA-482). In total, as alleged in the SAC, these timing issues resulted

in immaterial adjustments to net sales in the amount of $46 million (2.1% of sales)

in fiscal year 2014; $79 million (2.9%) in fiscal year 2015; and $42 million (1.9%)

for the first nine months of fiscal year 2016. (JA-233). Significantly, sales for Hain

as a whole increased substantially from 2014 to 2016, even with the corrections.

(JA-519 (Form 10-K)).

In addition, Hain disclosed that it had conducted an evaluation of its internal

controls on financial reporting as of June 30, 2016, and found its controls were not

effective as of that date due to "an insufficient number of personnel appropriately

qualified to perform control design, execution and monitoring activities," and "an insufficient number of personnel with an appropriate level of U.S. GAAP knowledge and experience." (JA-231–32; *see also* JA-524 (Form 10-K)). Hain also disclosed that the Company had not effectively designed its revenue recognition procedures. (JA-524).

On December 11, 2018, the SEC announced settled charges against Hain, following Hain's 2016 self-disclosure. The SEC Order focused on four types of sales practices and incentives involving distributors: "(1) cash incentives (up to $500,000), (2) extended payment terms (up to 90 days), (3) discounts off list price (up to 20% off), and (4) spoils coverage, whereby Hain agreed to reimburse the distributor for products that spoiled or expired before the distributor could sell through to retailers." (JA-360). The SEC publicly announced its conclusion that "[n]one of these types of incentives are improper." (JA-360).

Throughout the SEC's exhaustive multi-year investigation, Hain "assisted with the Commission's investigation" robustly. (JA-364). This helped the SEC conclude that the sole violation related to Hain's failure to maintain effective internal controls and accurate books and records—something Hain itself had identified and disclosed. (*See* JA-364). The SEC did not charge the Company with securities fraud. Nor did it impose a monetary penalty of any sort. The SEC did not take any action against any Hain executives.

4

Although Hain's 2016 Form 10-K identified "rights of return of product" as one of the sales practices under review (JA-231), the SEC Order says nothing about an "absolute" or "unconditional" right of return or suggested that there were in fact any unusual returns. To the contrary, the SEC concluded that "[t]he **_vast majority_** of the products purchased in connection with [end-of-quarter] sales" to major distributors were "**_ultimately sold through_** to retailers." (JA-362 (emphasis added)). And a "vast majority" it was—over 99 percent. (JA-361). As held below, this flatly refutes Appellants' whole theory.

### B.    The SAC's Allegations

In the SAC, as summarized by this Court and the District Court, "Plaintiffs' theory of the case is: 'Defendants made statements attributing Hain's high sales volume to strong consumer demand, while omitting to state that increased competition had weakened consumer demand and that Hain's high sales volume was achieved in significant part by the offer of unsustainable channel stuffing incentives.'" (SPA-3 (quoting _In re Hain Celestial Grp., Inc. Sec. Litig._, 20 F.4th 131, 137 (2d Cir. 2021)). Plaintiffs characterized the alleged acts forming the basis of their claims as "unsustainable business practices" or "unsustainable pull-in sales practices." (JA-187; JA-205–07). These are the same alleged practices on which Hain's internal company and audit committee reviews focused. (JA-481 (Form 10-K)). These are also the same practices investigated by the SEC. (_See_ JA-360).

5

According to the SAC, these practices were "designed to load Hain's customers and distributors with excess product at the end of fiscal quarters" by "offering customers and distributors generous 'sales concessions' including substantial discounts, rights of return, and rights of reimbursement for perishable product that spoiled before being sold." (JA-187). Appellants claim that Hain's "failure to disclose reliance on its unsustainable sales tactics . . . misleadingly created the impression that Hain was able to meet its projections and analysts' expectations based on organic factors," not "sales practices that inherently did not reflect normal and maintainable demand." (JA-206–07).

Hain allegedly negotiated with distributors to provide "credits and 'off-invoice' concessions in exchange for distributors taking the amount of inventory necessary for Hain to meet its quarterly sales numbers." (JA 208–09). Allegedly, a distributor was "free to return" that inventory after the quarter ended. (JA-208). In a wholly conclusory and utterly vague way, the SAC alleges that the distributors in fact "returned the excess inventory that was shipped" at the end of each quarter, doing so at the beginning of the "following fiscal quarter." (JA-208 ¶¶ 63–65). Like the earlier Complaint (the CCAC) that the District Court dismissed on these grounds, the SAC fails to identify the amount or percentage of returns, any specific agreements for returns, or any specific return transactions. Nor, remarkably, does it

allege whether returns impacted revenues or operating income in any reporting period (and if so to what extent).

Appellants' SAC discusses the SEC Order at length to spin it as supporting Appellants' claims—even though the SEC Order actually refutes those claims, as held below. (JA-834). The SEC investigated these very same sales practices for years and, in the end, did not charge Hain or its executives with securities fraud or impose a monetary penalty of any sort. As demonstrated below, the SEC Order is another hurdle Appellants cannot clear.

### C.    Procedural History

The Honorable Judge Spatt twice granted motions to dismiss Appellants' claims (JA-137 and JA-813), holding that Appellants failed to adequately plead: **(i)** a fraudulent scheme under Rules 10b-5(a) and (c); **(ii)** any actionable omission under Rule 10b-5(b); and **(iii)** scienter.

On the earlier appeal, this Court did not disturb the dismissal of the clause (a) and (c) claims (and those claims are no longer at issue). However, the panel went on to hold that Judge Spatt erred in his analysis of the clause (b) claim because he "imported the requirement of clauses (a) and (c) of a fraudulent scheme or practice into clause (b)." 20 F.4th at 136. The Court therefore vacated Judge Spatt's decision and directed the District Court to analyze the Section (b) claims "afresh." 20 F.4th at 137–38.

The Court also instructed the District Court to "independently reassess the sufficiency of the scienter allegations, considering the cumulative effect of the circumstantial allegations of intent together with the pleaded facts relating to motive and opportunity." 20 F.4th at 138. The Court expressed "no views on whether, when weighed cumulatively, these allegations are sufficient to plead scienter." 20 F.4th at 138.

While the appeal was pending, Judge Spatt passed away. As a result, on remand the case was reassigned to The Honorable Joanna Seybert. At Judge Seybert's direction, the parties submitted supplemental briefing on the motion to dismiss the SAC. The Court then referred that motion to dismiss to Magistrate Judge Dunst.

After conducting a *de novo* analysis as directed by this Court, Magistrate Judge Dunst reached the same result as Judge Spatt and recommended that the SAC be dismissed again, and again with prejudice. (JA-960 (the "Report and Recommendation" or the "R&R")). The R&R found that Appellants **(i)** failed to adequately plead any actionable omission under Rule 10b-5(b) and **(ii)** failed to plead scienter. Magistrate Judge Dunst recommended that the SAC be dismissed with prejudice because Appellants "were expressly afforded the opportunity" to "bolster[] their allegations" when Judge Spatt dismissed the CCAC but failed to do so. (JA-1026–27).

8

Judge Seybert issued an opinion and order (the "Order") adopting Magistrate Judge Dunst's recommendation to dismiss with prejudice all claims asserted by Appellants. (SPA-1). Judge Seybert found Magistrate Judge Dunst's "scienter-related recommendations to be thorough and well-reasoned" and rejected Appellants' objections to those recommendations. (SPA-60). Judge Seybert also expressly noted that she concurred with "Magistrate Judge Dunst's threshold recommendations finding that Plaintiffs have failed to plead an actionable misstatement or omission" (SPA-45 & SPA-60 (a "finding . . . with which the [District] Court concurs")), while not expressly referencing that recommendation in the portion of her Order adopting the R&R (SPA-6). Judge Seybert went on to hold that dismissal with prejudice was proper because (1) Magistrate Judge Dunst properly found that amending the SAC would be futile; (2) Appellants did not even request leave to amend; and (3) "despite the Magistrate Judge's recommendation of dismissal with prejudice, in their Objection, Plaintiffs fail[ed] to articulate any new facts that would rectify the deficiencies of their pleadings." (SPA-58–60).

## SUMMARY OF ARGUMENT

*First*, the District Court properly dismissed the Complaint based on scienter. The District Court considered each scienter argument individually and then expressly considered the individual allegations collectively, as directed by this Court

in its previous decision, and held that that Appellants failed to allege scienter. (*See, e.g.*, SPA-11, SPA-45–58).

*Second*, the District Court properly held that the SAC should be dismissed with prejudice. Appellants have had three chances to amend their pleadings, which have now been dismissed repeatedly, by three different Judges. The dismissal with prejudice should be affirmed because Appellants again have failed to articulate that amendment would not be futile (and, indeed, do not even make the attempt) and because forcing the Appellees to defend yet again supposed conduct from over a decade ago would be incredibly unfair and prejudicial.

*Third*, this Court should affirm the District Court's finding that there can be no control person liability without a primary violation.

*Finally*, as to the grounds for the dismissal, while the District Court correctly dismissed the SAC on scienter grounds—and this Court can and should affirm on that scienter basis alone—the District Court also explicitly noted its concurrence with Magistrate Judge Dunst's separate recommendation that the SAC should be dismissed on the independent ground that it "failed to state a claim . . . due to Plaintiffs' failure to plead an actionable misstatement or omission." (JA-1026). This Court could certainly affirm on that alternative ground as well.[1]

---

[1] The statements alleged "were not actionable" both because they turned entirely on insufficient CW allegations of falsity that were properly rejected as "too conclusory

Accordingly, the Court should affirm the District Court's Order dismissing the SAC with prejudice.

## **ARGUMENT**

## I. THE DISTRICT COURT PROPERLY FOUND THAT APPELLANTS FAILED TO ALLEGE SCIENTER

Scienter allegations are subject to the heightened pleading standards of Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). In particular, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005). A court reviewing scienter allegations must "engage in a comparative evaluation," considering "not only inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

A plaintiff can allege scienter either by (a) alleging facts to "show that defendants had both motive and opportunity to commit fraud" *or* (b) alleging facts that "constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995). As this

---

and generic" and because Hain in fact adequately disclosed various sales incentives and promotions, "obviating any further need for disclosure." (SPA-9). Similarly, the SAC's allegations regarding accounting controls fell short because they either focused on "nonactionable opinion statements" or the alleged falsity at the heart of these allegations was negated by the SAC's own allegations and the SEC Order incorporated into the SAC. (SPA-9–10).

Court confirmed in its earlier decision (as duly noted by the District Court below), a court must consider "the cumulative effect of the circumstantial allegations of intent together with the pleaded facts relating to motive and opportunity." (SPA-46 (quoting *Hain*, 20 F.4th at 138)). However, of course, the command to consider scienter allegations collectively "does not permit Plaintiff 'to combine inadequate allegations of motive with inadequate allegations of recklessness to demonstrate scienter.'" *In re Diebold Nixdorf, Inc., Sec. Litig.*, 2021 WL 1226627, at *15 (S.D.N.Y. 2021) (citing *Kalnit v. Eichler*, 264 F.3d 131, 141 (2d Cir. 2001)). "After all, zero plus zero (plus zero plus zero plus zero) cannot equal one." 2021 WL 1226627, at *15 (quotation marks omitted).

The District Court applied this law correctly, considered the "cumulative effect" of the SAC's scienter allegations, and properly found them fatally insufficient, singularly and collectively, in express compliance with this Court's direction. (*See* SPA-46 (quoting *Hain*, 20 F.4th at 138)).

## A. The District Court Correctly Found that Appellants Failed to Plead "Motive and Opportunity"

A showing that defendants had both motive and opportunity to commit fraud requires allegations showing that the Individual Defendants benefitted in some concrete and personal way from the purported fraud. *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). Appellants attempted to meet that burden by focusing on compensation and bonuses

12

received by the Individual Defendants and various stock sales and transactions. The District Court, however, agreed with the R&R's finding that Appellants' "reliance upon the Individual Defendants' (a) stock sales, (b) compensation and bonuses, and (c) use of Company stock in certain acquisitions" was "unpersuasive." (SPA-11 (citing JA-1006–07)). Appellants do not provide any cogent reason for this Court to disagree with these findings by both Magistrate Judge Dunst and Judge Seybert (and Judge Spatt before them, twice).[2]

### 1. The Stock Sales Do Not Support a Motive to Commit Fraud

Stock sales must be "unusual" to support a strong inference of scienter. *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir. 2001). Appellants agree (Br. at 42) that the "relevant factors" for this inquiry include "the amount of profit from the sales, the portion of stockholdings sold, the change in volume of insider sales, and the number of insiders selling," *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 419 (S.D.N.Y. 2020), as well as "whether sales occurred shortly before corrective disclosures or materialization of the alleged risk," *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 587 (S.D.N.Y. 2011). Appellants

---

[2] Appellants' brief does not mention the "acquisitions" argument made below (let alone address the District Court's reasoning for rejecting the argument) and it is therefore waived. *See generally Snowbridge Advisors LLC v. Soho Square Cap. LLP*, 2023 WL 8368630, at *1 n.1 (2d Cir. 2023) (arguments not addressed in appellate briefs are waived). In any event, the District Court correctly found that Appellants "fail to identify any unique connection between the alleged fraud and the subject acquisitions that could support such an inference." (SPA-50).

13

contend that certain purportedly "unusual" stock sales by Defendants Irwin Simon (CEO) and John Carroll (CEO of North America) meet these tests and provide a motive strongly supporting a finding of scienter. (Br. at 41–44). They do not.

As Judge Spatt previously found (twice), Magistrate Judge Dunst and Judge Seybert correctly found that the allegations of motive based on these stock sales failed for three reasons. *First*, the complete failure to allege net profits from any stock sales eliminated any inference of scienter, because the allegations of sales alone "say[s] nothing about a seller's motive." (JA-1007 (collecting cases)). *Second*, the last stock sales alleged were "over eight months before the first allegedly negative disclosure," the kind of timeline that courts have frequently held is ***not*** indicative of scienter. (JA-1008 (collecting cases)). *Third*, allegations against only two insiders and the absence of such allegations against the others "undercuts" any inference of scienter. (JA-1009 (collecting cases)). Appellants do not dispute that they failed to plead any profit, a persuasive timeline, or that any other insiders sold any shares. Instead, they simply disagree with the conclusion by multiple Judges below. Appellants are wrong.

Proceeds from stock sales say nothing about a seller's motive if there is no allegation identifying net profit. *City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*, 2021 WL 212337, at *8 (S.D.N.Y. 2021) (no scienter because plaintiffs alleged the "***proceeds*** from the sales,

14

rather than profit"), *aff'd*, 2021 WL 5142702 (2d Cir. 2021). Appellants admit they did not plead net profits, but complain that "the amount of profit from the insider sales is merely among the relevant factors to the scienter determination, not a dispositive factor." (Br. at 42–43 (internal quotation marks omitted)). But the Court below never suggested that this factor prevailed in isolation, rendering Appellants' argument yet another mischaracterization. The District Court could not have been clearer or more explicit, explaining in straightforward terms that while "failure to allege net profits . . . is a relevant factor" it "clearly was not dispositive" in Magistrate Judge Dunst's analysis. (SPA-48). Appellants' argument is silly and misleading.

Perhaps most significant is the disconnect between the allegations in the SAC and the timing of any stock sales. Appellants wrongly claim that the R&R "cherry-picks" case law and uses "arbitrary metrics" when simply recognizing the commonsensical notion that the timing of the stock sales here ***undercuts*** any inference of scienter. (Br. at 42–43). The law is clear: "courts in this Circuit are frequently skeptical that stock sales are indicative of scienter where no trades occur in the months immediately prior to a negative disclosure." (JA-1008 (quoting *Chapman v. Mueller Water Prods., Inc.*, 466 F. Supp. 3d 382, 412 (S.D.N.Y. 2020)). For obvious reasons, trades made long before disclosures negate an inference that

15

the sellers were "rush[ing] to cash out" before the disclosure. *Chapman*, 466 F. Supp. 3d at 412.[3]

Scienter is further negated, as argued below, by the fact that the sales alleged were actually made to pay taxes on the vesting of restricted stock and the exercise of expiring stock options. Although Magistrate Judge Dunst did not find it necessary to reach this issue (JA-1010 n.21), courts have repeatedly held that such transactions are inconsistent with an intent to commit fraud. *See Fries v. N. Oil & Gas, Inc.*, 285 F. Supp. 3d 706, 720 n.5 (S.D.N.Y. 2018); *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004); *Ressler v. Liz Claiborne, Inc.*, 75 F. Supp. 2d 43, 59–60 (S.D.N.Y. 1998). So too here.

In addition, Appellants do not—and cannot—dispute that there are no other insider sales, including none by the other two individual defendants (Smith and Conte). Appellants claim that "[a]t most, this fact would undermine an inference of scienter only as to those two Defendants, and not Simon and Carroll (and therefore not Hain)." (Br. at 43). That is not the law. This Court has held that "the fact that *other* defendants did not sell their shares during the relevant class period sufficiently undermines plaintiffs' claim regarding motive." *Rotunno v. Wood*, 2022 WL

---

[3] Appellants incorrectly suggest that Magistrate Judge Dunst held that the trading *must* take place in the final 100 days of the class period, but instead the R&R talks about timing to support its persuasive conclusion that the sales alleged here were neither unusual nor suspicious. (SPA-27–28; JA-1008).

14997930, at *2 (2d Cir. 2022) (emphasis added and citation omitted). In accordance with this law, the lower court correctly found that this factor undercuts scienter. (JA-1009–10). If (as alleged) Smith and Conte were "direct and substantial participants in the fraud" (JA-191–92 ¶¶ 27–28), their failure to sell shares undercuts corporate scienter. *See San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 814 (2d Cir. 1996).

### 2. Bonuses Do Not Support Scienter

Again like Judge Spatt did twice before, Magistrate Judge Dunst and Judge Seybert found that the SAC's allegations relating to Carroll's and Simon's compensation do not support an inference of scienter. This finding is in lockstep with the settled principle of Second Circuit law that "yearning for an increase in stock prices to improve executive compensation does not support scienter because 'virtually all corporate insiders' share that desire." (JA-1011 (citing *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009)).

Contrary to Appellants' argument (Br. at 45), this well-established principle applies equally to sales figures—*i.e.*, financial performance—as it does to stock prices. *See, e.g.*, *Maloney v. Ollie's Bargain Outlet Holdings*, 518 F. Supp. 3d 772, 779 (S.D.N.Y. 2021) (desire to increase sales is "no different from the desire for the corporation to appear profitable—which courts have repeatedly held to be insufficient") (collecting cases); *Francisco v. Abengoa, S.A.*, 624 F. Supp. 3d 365,

400 (S.D.N.Y. 2022) (receipt of bonuses based on contract performance and profit margins was not indicative of scienter).

In the motive context, contrary to Appellants' argument, this Court draws no distinction between corporate earnings or appearance of corporate profitability on the one hand and higher stock prices *per se* on the other. *See, e.g.*, *ECA*, 553 F.3d at 201; *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000). Despite their argument to this Court (Br. at 45), Appellants recognize that this is a distinction without a difference in the very next paragraph of the SAC. (*See* JA-296 ("Defendants were further motivated to artificially inflate Hain's share price")). The suggestion that the Court below misapprehended the SAC's allegations as an allegation that Defendants "manipulated Hain's **stock price**" directly, as opposed to indirectly by misrepresenting "***financial results***" (Br. at 45 (emphasis in original)) makes no sense and is plainly belied by the record below. Applying these well-established principles and after reviewing the specific allegations made here, Magistrate Judge Dunst correctly noted that the governing law "doomed" the argument that the bonuses established motive and scienter. (JA-982, JA-1011).

Although Appellants castigate Judge Seybert for adopting this conclusion "with no substantive analysis" (Br. at 45), in fact Judge Seybert made explicit that she "reviewed *de novo*" the issue and expressly found that the Magistrate Judge "fairly summarized" Appellants' arguments, "properly assessed" the allegations in

the SAC, correctly applied the case law, and made "bonuses-related finding[s]" as to which she overruled the objections (SPA-5, SPA-49). To contend as Appellants do that this reflects "no substantive analysis" is, again, a misleading characterization that does not survive even casual scrutiny.

### B. The District Court Correctly Found that Appellants Failed to Plead "Conscious Misbehavior or Recklessness"

Without an adequate showing that defendants had both motive and opportunity to commit fraud, the strength of circumstantial allegations of conscious misbehavior or recklessness "must be correspondingly greater." *Kalnit*, 264 F.3d at 142. Recklessness means "conscious recklessness," which is a "state of mind approximating actual intent, and not merely a heightened form of negligence." *Novak*, 216 F.3d at 312. Such recklessness must "represent[] an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." 216 F.3d at 308. For the reasons set forth *infra*, and as repeatedly held below, Appellants' allegations fall short, both individually and collectively.

#### 1. The District Court Properly Found that the Allegations Regarding "Active Participation in" Purported "Unsustainable Sales Practices" Do Not Support a Strong Inference of Scienter

Appellants argue that "the Defendants' personal involvement in the undisclosed sales practices" supports scienter. (Br. at 23–24). This is based on

allegations relating to two types of alleged sales practices (general sales incentives and promotions, and an "absolute right of return"), both of which were found wanting below.[4]

### a. *Hain's Conceded Disclosure of Sales Incentives Negates Scienter*

As the lower court found, Hain ***disclosed*** the incentive sales practices at issue. "That finding 'precludes scienter' because making an accurate disclosure is the antithesis of" the kind of extreme recklessness "needed to substantiate scienter." (JA-1016 (R&R) (citations omitted)). The "undisclosed practices" that Appellants pleaded are that Hain allegedly "generated its sales in reliance on undisclosed, unsustainable pull-in sales practices," "such as offering discounts, cash incentives, extended payment terms, spoilage coverage, and the absolute right of return." (JA-168). Yet Hain concededly disclosed to the market the use of "promotional incentives . . . trade discounts and promotions . . . coupon costs . . . cash discounts . . . price discounts, slotting fees and coupons." (JA-155). These disclosures

---

[4] Appellants' cases concerning "personal involvement" generally are off the mark because, in those cases, the defendants had actual knowledge of internal reports directly contradicting their specific affirmative misstatements—unlike anything alleged here. *See In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 76–77 (2d Cir. 2001) ("Defendants publicly represented that returns were not increasing and failed to adjust revenues despite their knowledge of rapidly rising returns."); *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *14 (S.D.N.Y. 2016) (defendants had contemporaneous knowledge of inventory levels that contradicted public statements).

"specifically addressed the very risks" that Appellants allege Hain did not disclose. *Gluck v. Hecla Mining Co.*, 657 F. Supp. 3d 471, 490 (S.D.N.Y. 2023); *see also Altayyar v. Etsy, Inc.*, 242 F. Supp. 3d 161, 180 (E.D.N.Y. 2017) (statements not actionable for "omitting" information actually disclosed in SEC filings), *aff'd*, 731 F. App'x 35 (2d Cir. 2018).

Moreover, as the lower court rightly held, allegations regarding such sales practices and promotions "contribute little to a strong inference of fraud because such actions are common practice." *S.E.C. v. Espuelas*, 698 F. Supp. 2d 415, 430 (S.D.N.Y. 2010). Indeed, "the allegation that the sales at issue were made pursuant to incentives to meet goals set by management is an insufficient basis on which to infer conscious misbehavior or recklessness." *In re Bristol-Myers Squibb*, 312 F. Supp. 2d at 566; *c.f. Gavish v. Revlon, Inc.*, 2004 WL 2210269, at *15 (S.D.N.Y. 2004) (same).

   b.   *The Allegations Regarding a "Right of Return" Are "Too Sparse" to Support Scienter*

As to the "absolute right of return" allegations, the Court below found **both** that Appellants "fail[ed] to adequately plead that Hain offered the right of return alleged in the SAC" **and** that the SAC "fail[ed] to set forth sufficient facts to support an inference of scienter in connection with those allegations." (JA-1014 (cited at SPA 51–52)). Those two separate conclusions are of course linked. If, as correctly found below, the SAC failed to "sufficiently plead that Hain generated sales by

21

relying on such right of return" (JA-998–99), Appellants' reliance on the same allegations to establish scienter and recklessness in failing to disclose such a putative right to return unsurprisingly falls short. Appellants attempt to disavow their allegations concerning the "absolute right of return." As the lower court found, however, "[t]he SAC's allegations focus most on the absolute right of return." (JA-998). Indeed, the SAC focuses expressly on this supposed right of return in roughly 25 paragraphs. (*See* SPA-38). The allegations regarding the supposed "absolute right of return" clearly lie "[a]t the heart of Plaintiffs' claims." (JA-998). Appellants go so far as to assert that by "dwelling" on the "right of return" allegations, the District Court committed "reversible error, as this Court previously recognized." (Br. at 21). Nothing in this Court's earlier decision supports that assertion. Nor did the Court below focus on the right-of-return claims to the exclusion of the SAC's other claims, as discussed *infra*.

In any event, the Court below found that the SAC's "allegations regarding Defendants' knowledge of the right of return are too sparse" to "support an inference of scienter in connection with" any right of return. (JA-1014–15 (quoted at SPA 51–52)).[5] This holding was supported by a detailed review of the "vague and conclusory" CW allegations, to which we now turn.

---

[5] Appellants argue that "the District Court again misunderstood Plaintiffs' theory of this case" because it "again [like Judge Spatt] unduly focused on the SAC's right-

c.  *The CW Allegations Do Not Support Scienter*

A confidential witness must "provide an adequate basis for believing that the defendants' statements were false." *Novak*, 216 F.3d at 314. "A plaintiff cannot base securities fraud claims on speculation and conclusory allegations." *See Kalnit*, 264 F.3d at 142. CW statements that are too general, nonspecific, indirect, or temporally vague will not be credited. *See, e.g.*, *Schiro v. Cemex, S.A.B. de C.V.*, 396 F. Supp. 3d 283, 305 (S.D.N.Y. 2019); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 352 (S.D.N.Y. 2011). To be credited, CW allegations must be sufficiently detailed, point to specific reports or evidence, *Novak*, 216 F.3d at 311, and basically do more than rely on "general and second-hand" allegations, *Francisco v. Abengoa*, 481 F. Supp. 3d 179, 208 (S.D.N.Y. 2020); *see also In re Coty Inc. Sec. Litig.*, 2016 WL 1271065, at *6 (S.D.N.Y. 2010) (CWs' "conclusory, nonspecific" statements that sales were "struggling," "forecasted to be down," and "smaller than expected" were insufficient); *In re IAC/InterActiveCorp Sec. Litig.*, 695 F. Supp. 2d 109, 119 (S.D.N.Y. 2010) ("general" allegations by CWs lacking "facts that might corroborate" them failed).

---

of-return allegations." (Br. at 20). But that argument ignores the actual text of the Order on appeal. Both Magistrate Judge Dunst and Judge Seybert spent almost as much time discussing the other allegedly "unsustainable sales practices" as they did discussing the putative "absolute right of return."

Magistrate Judge Dunst, like Judge Spatt twice before him, found the CW allegations to be conclusory, generic, and ultimately insufficient (JA-999), and Judge Seybert likewise held that "the CWs' allegations" as a whole were "too vague, speculative, and conclusory to support an inference of scienter" (SPA-57). In their objection to the R&R, Appellants chose not to even "discuss any particular CW or specific allegation or identify why these CW statements are not too conclusory and vague to be credited." (SPA-57). Their belated and desultory efforts to do so now (Br. at 39) fare no better than their strategy of silence below.

As repeatedly held below, the CW allegations obviously fall short. As an initial matter, the CWs are simply not in a position to know the things on which Appellants hang their hats.

- CW 1, whose work involved "finances related to Hain's manufacturing costs," admittedly had "limited involvement" or knowledge of credits given to distributors outside of being "instructed" by unidentified personnel to "post" credits in order to track "money that distributors owed Hain." (JA-43, JA-57, JA-62 ¶¶ 32, 83, 103).

- CW 2 worked for a smaller brand at Hain called BluePrint, with no responsibilities relating to Hain's overall sales or financial reporting practices or anything outside of the BluePrint brand. (JA-199 ¶ 33).

- CW 3 was an "Executive Assistant," and there is no allegation that CW 3 had any substantive responsibility for the preparation or reporting of financial figures or would possess any meaningful knowledge of sales, financial reporting, or accounting practices. (JA-200 ¶ 34).

- CW 4's work allegedly related exclusively to marketing "non-dairy products," and there is no allegation that CW 4 had any responsibility for financial reporting. (JA-200 ¶ 35).

24

- CW 5 never worked for Hain. (JA-200 ¶ 36).

- CW 6 worked in sales and operations, performing "customer service tasks," which allegedly involved "processing" but not "ask[ing] any questions about UNFI's product returns," with no role negotiating with distributors. (JA-55, JA-60 ¶¶ 37, 72, 93).

- CW 7's allegations that CW 7 was "not supposed" to be hearing discussions about "Hain's financial arrangements" and that "Carroll and Simon tried to be secretive" about sales practices demonstrates that CW 7 was not in a position to understand management's broader strategy or relevant details of Hain's accounting or financial reporting practices. (JA-218–19 ¶ 95). Relatedly, CW 7's allegations that another individual (not CW 7) "was responsible for everything related to Hain's accruals" further demonstrates that CW 7 was not in a position to possess any meaningful knowledge of sales, financial reporting, or accounting practices. (JA-215–16 ¶ 85).

- CW 8 and the basis for his alleged knowledge is described in a particularly opaque way. He was allegedly "working with Hain's production team" and the SAC attributes to him conclusory assertions about what he "heard," "learned about," or what "became clear" to others, with no attribution or explanation. (JA-224–25 ¶ 117).

Thus, as to each CW, the allegations in the SAC actually "undermine[] the likelihood that [the CW] had personal knowledge of the allegations." *Janbay v. Canadian Solar*, 2013 WL 1287326, at *8 (S.D.N.Y. 2013), *aff'd* (2013).[6]

---

[6] On this score, Appellants cite cases that are readily distinguishable as they involve CWs with direct knowledge. *See City of Warren Police & Fire Ret. Sys. v. World Wrestling Entm't Inc.*, 477 F. Supp. 3d 123, 132, n.1 (S.D.N.Y. 2020) (CW had direct involvement in the specific deal at issue); *New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 13–14 (2d Cir. 2011) (CWs "recall[ed] detailed discussions" about "inventory crisis" during meetings each "participated in"). Appellants also point to *In re Avon Sec. Litig.*, 2019 WL 6115349, at *21 (S.D.N.Y. 2019), for the proposition that a CW need not have direct contact with an individual defendant. Though a CW's lack of direct contact with a defendant alone may not be fatal to

Even if the CWs passed the "personal knowledge" test, their allegations are far too general, indirect, or temporally vague to support an inference of scienter. As held below (SPA-57), that is precisely the nature of the allegations here and that is precisely why they fail.

- CW 1 generally discusses credits being entered but provides no specifics on any particular credit. This CW does not describe any products involved, the reason for the credit, or the percentage of that credit. (*See, e.g.*, JA-57–59 ¶¶ 83, 84, 89).

- CW 2 discusses Hain's intent to meet end-of-quarter numbers and that Hain "pushed inventory," without identifying what inventory, how much, or the nature of the "pushing," and without any allegation that the sales were illusory or anything other than (as indicated by the SEC) real sales for real money. (JA-213 ¶ 78).

- CW 3 claimed generally that he "constantly" saw products being returned and credits being issued, "especially" with UNFI. He did not describe the products returned, the amounts returned, or what percentage of sales for which these returns accounted. (JA-212 ¶ 75).

- CW 4 generally discusses that Hain "would ship inventory to distributors" at the end of each quarter, without identifying what inventory or the circumstances of those inventory sales. While this CW identified an alleged amount of transactions in the last week of the quarter, there is no comparison to the rest of the quarter and there is no allegation that these distributors did not actually order these products at the end of each quarter

---

crediting the CW's testimony, the Complaint still must plead facts with "sufficient particularity" to show the source of knowledge, which in *Avon*, included a finding that the CWs "each w[ere] in position to possess information about" the specific allegations and were "aware of the extent to which the individual Defendants were involved in those same practices" including by "identify[ing] particular reports containing non-public information reviewed by the Defendants." 2019 WL 6115349, at *21. Here, the CW allegations rely on vague rumblings from unspecified sources that do not provide the detail required by this Court.

or identification of the volume purportedly returned. (JA-211–12, JA-214–15 ¶¶ 73, 81).

- CW 5 worked for a different company that provided warehousing services for Hain. He makes the allegation that Hain "would always have visibility" into its inventory at the warehouse. (JA-216–17 ¶ 88). There is nothing in this general statement that suggests any wrongdoing.

- CW 6 discusses unspecified "concessions" and "incentives" provided to UNFI at unspecified times and "that he generally processed $500,000 in returns each quarter, that he once processed a $700,000 return in 2015, and that unnamed distributors were 'free to return' Excess Inventory." Again, like the others he cites no context for these concessions or incentives, why they were provided, or why they are inappropriate. (JA-54–55 ¶¶ 71, 72).

- CW 7 alleges unspecified "financial arrangements" with a distributor and "that 'Hain had an agreement with its customers that if the customers could not sell the excess inventory, they could return the unsold inventory.'" But, like the others, this allegation is "bereft of particulars." (JA-1016; JA-60 ¶¶ 94–95). CW 7 does not identify what inventory could be returned, on what conditions, what products, the volume, the specifics of any particular agreement, or the amount of any particular return. (*See* JA-60 ¶¶ 94–95).

- CW 8 references vague "contract-related issues" and "deals" that purportedly caused unspecified "accounting problems" but does not discuss any contracts or problems in detail and only mentions that "at the end of quarters, Hain was making big deals with customers like UNFI and KeHE" without any other context, including whether the deals were inappropriate in anyway. (JA-224 ¶¶ 116, 117).

The common theme here, as found below, is the complete absence of any specifics regarding any returns. As we know from the SEC Order, this lack of specificity makes sense because 99 percent of the shipments actually "sold through" to retailers and so there were no returns on 99% of the shipments. (JA-361).

27

As the opinions below make clear, Appellants are wrong to claim that the lower court based its dismissal on the hearsay nature of the allegations alone. (Br. at 39). To be sure, CW allegations that "report only unreliable hearsay . . . demonstrate that the [CWs] are not reliable." *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996 (9th Cir. 2009). But the District Court did not base its dismissal solely on the hearsay nature of the CW allegations. The SAC's CW allegations are filled with vague undated allegations and passively-stated generalities. (*See* JA-215–17 ¶¶ 82–90). By way of one example only, Judge Spatt explained that he did not credit CW 5's allegations because the SAC "does not explain how CW 5 knew, or how he was even led to merely 'understand,' that UNFI did not pay for product" and "does not state that [CW 5] reviewed invoices, or saw any proof that UNFI did not pay for the product." (JA-164; JA-963–64; *see also* JA-832).

Appellants argue that the District Court erred by "fail[ing] to account for the corroboratory nature of [the CWs'] allegations." (Br. at 40). But that is not so. Magistrate Judge Dunst specifically addressed the alleged overlapping nature of the CW allegations and found them lacking. (*See, e.g.*, JA-966–68). Indeed, the R&R directly rejected each of the examples of corroboratory allegations Appellants provide. (*See* JA-965–66, 969–70, 1016–18).

28

        d.    *The Lower Court Correctly Found that the SEC Order Provides a Compelling Competing Inference*

The lower court rightly acknowledged that the SEC Order (incorporated into the SAC by Appellants) undermines any inference of wrongful intent.  (SPA-52; JA-1015–16).  The SEC Order affirmatively stated that there was nothing "improper" with Hain's sales practices, and the SEC did not charge the company or any individual with fraud.  (*See* SPA-52).  While the SEC found books-and-records and internal controls violations, those, "without more, are insufficient to state a claim." (JA-169; *cf. Rotunno*, 2022 WL 14997930, at *3 (accounting violations, on their own, are insufficient to state a claim)); *ECA*, 553 F.3d at 200.  Curiously, Appellants attempt to diminish the relevancy of the SEC Order (*e.g.*, Br. at 26–27), which they chose to incorporate into the SAC.  But that argument ignores the law.  *See Kleinman v. Elan Corp., plc*, 706 F.3d 145, 152 (2d Cir. 2013) (courts "consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit"); *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 462 (2d Cir. 2019) (same); *Price v. Strianese*, 2017 WL 4466614, at *3 n.3 (S.D.N.Y. 2017) ("Because Plaintiff incorporates the SEC order by reference into his Complaint, the Court may rely on it in deciding Defendants' motion to dismiss."); *Presbyterian*

*Healthcare Servs. v. Goldman Sachs & Co.*, 2017 WL 1048088, at *5 (S.D.N.Y. 2017) (same).

Moreover, as the District Court recognized, Appellants' allegations regarding a right of return and the other incentives fail because there ***was*** strong consumer demand for Hain's products, as shown by the distributors' sale of the "vast majority" of products at issue (as the SEC found). (*See* SPA-39). As found by the SEC Order cited in the SAC, "the incentives [were not] improper." (JA-360).

### 2. SOX, GAAP, and Internal Controls Violations Do Not Support Scienter

Appellants also argue that Hain's eventual conclusion (and prompt public disclosure) that Hain lacked sufficient internal controls suggests that Appellees "were aware of the misleading nature of their [earlier] public statements" at the time that they were made. (Br. at 27, 28–31). But that is not the law. As Judge Spatt (JA-155), Magistrate Judge Dunst (JA-1016), and Judge Seybert (SPA-53–54) all correctly recognized, Sarbanes-Oxley certifications attesting to the effectiveness of internal controls later determined to have been ineffective do not suffice. *See, e.g.*, *Rotunno*, 2022 WL 14997930, at *3. As Judge Seybert persuasively held, Appellants must adequately allege that defendants had "knowledge of 'glaring accounting irregularities' ***when they executed the SOX certifications***." (*See* SPA-53–54 (emphasis added)). They obviously did not. Nor did Hain's auditors. (*See* JA-860). The SAC thus fails.

30

Similarly, allegations of GAAP violations or remediation of internal controls, without more, simply do not support scienter. *See Rotunno*, 2022 WL 14997930, at *3. That is particularly so here, where the SEC concluded that "none" of the sales practices at issue were improper (JA-360 ¶ 5), and the revision to net sales was 2.9 percent or less for the years at issue, relating to the timing of when actual sales were recognized (JA-976–77 n.6). There has never been a dispute that Hain sold "real products [that] were shipped to real customers who paid real money." *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d at 568. Where ineffective controls and improper accounting are alleged, establishing the requisite conscious misbehavior or recklessness requires "far 'more than a misapplication of accounting principles.'" *Iowa Pub. Emp's. Ret. Sys.*, 919 F. Supp. 2d 321, 333 (S.D.N.Y. 2013) (quoting *SEC v. Price Waterhouse*, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992)); *accord* SPA-53–54. The requisite "highly unreasonable" conduct, *In re Carter-Wallace, Inc., Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000), cannot be shown with accounting standards violations alone, *In re China Organic Sec. Litig.*, 2013 WL 5434637, at *10 (S.D.N.Y. 2013).

As this Court held in *Rotunno*, even the combination of a "fail[ure] to maintain adequate internal controls, . . . false Sarbanes-Oxley certifications, and . . . a significant accounting error that violated GAAP" was not sufficient to show

"scienter without additional, concrete allegations of fraudulent intent." 2022 WL 14997930, at *3. Such allegations are lacking here.[7]

Appellants' efforts to argue the contrary fall far short and were properly rejected below. In this regard, Appellants rely heavily on *Cannavest*. (*See* Br. at 28–29). That decision was rightly distinguished below. The allegations in *Cannavest* "established that the company **knew** of its accounting failures." (SPA-53 (emphasis added)). In contrast, as Judge Seybert and Magistrate Judge Dunst held, here Appellants "neither undermined the assertions in the SOX Statements . . . nor adequately pled that Defendants knew or were reckless in not knowing that the Company's internal controls were deficient" and instead "rely only on facts occurring **after** Individual Defendants signed their certifications, namely the post-Class Period disclosures of material weaknesses in Hain's internal controls . . . That dog won't hunt." (SPA-53–54 (emphasis added)).

### 3. The Employment Status Changes Do Not Support Scienter

Appellants argue that scienter is also established by what they call "suspicious personnel changes." (Br. at 17). But as the District Court correctly held, there was nothing alleged in the SAC that made these changes in employment at all suspicious.

---

[7] Appellants cite cases (Br. at 29) that are inapt, as the defendants in those cases **knew** of internal controls deficiencies. *See, e.g.*, *In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 632–33 (S.D.N.Y. 2014) (defendants "aware . . . if not directly in control of" the deceptive acts). As described *infra* at 54, Appellants' allegations are not similarly supported here.

There is a complete "dearth of facts indicating [that any of] those changes are 'tied to' the alleged fraud." (SPA-55).

In response, Appellants bootstrap the allegations attributed to various CWs about the alleged misconduct and gloss over the weakness of those allegations pointed out by the District Court. (Br. at 32–36). Appellants assure this Court that "multiple CWs *explicitly* tie many of the departures and demotions at issue ***directly*** to the fraud." (Br. at 35). But the SAC belies that bold assertion.

Appellants point to allegations related to "the departures of [various executives, including] Ng, Powhida, Smith, and Weiner, and the demotion of Meiers" (Br. at 32) but do not really engage with the District Court's findings related to these very employment changes. The R&R found "allegations regarding the demotion of Meiers and the terminations of Powhida, Ng, and Hyndman are irrelevant to the Individual Defendants' scienter because Plaintiffs do not allege the Individual Defendants were involved in those employment changes." (JA-1021–22 (collecting cases)). "Plaintiffs cite no authority for the proposition that Smith's post resignation unemployment supports scienter [and provide] an insufficient basis for CW 1's subjective belief that Smith was forced out for unwillingness to support Simon." (JA-1019 (collecting cases)). As to Simon, Appellants ignore that he left ***16 months*** after the Class Period ended, which the lower court correctly held "cuts against such an inference." (JA-1021 (citing *Wilbush v. Ambac Fin. Grp., Inc.*, 271

33

F. Supp. 3d 473, 499 (S.D.N.Y. 2017) (resignations "not highly unusual or suspicious because none of them occurred at or about the time that Defendants' alleged fraud was disclosed")). Rotely restating those various allegations without addressing (let alone providing case law contradicting) the District Court's rejection of them does not advance Appellants' ball.[8]

Simply put, as the R&R correctly noted (and the District Court agreed), employment changes "are insufficient alone to establish an inference of scienter," absent independent evidence suggesting the change was highly unusual, which Appellants "fail[ed] to" establish. (JA-1018 (citation omitted); *see also* SPA-54–56; JA-170; JA-841–42 (Judge Spatt finding twice that these allegations were similarly insufficient, even after Appellants had a chance to bolster them)).

### 4. The "Core Operations" Theory Does Not Support Scienter

Appellants invoke the "core operations doctrine" to allege that "it is implausible to suggest that the Individual Defendants were unaware of Hain's

---

[8] Appellants claim that the District Court "fail[ed] to properly account" for the timing of the various employee departures. (Br. at 35). But the District Court addressed and rejected these allegations, specifically including the timing, and distinguished *Salix*, which Appellants cited below and again here. (SPA-54–55; Br. at 35). The District Court correctly observed that the *Salix* court "found the resignations of top company executives to be highly unusual and suspicious because the company Board exercised the clawback provisions in their resignation agreements, which provisions allowed for a clawback based on a Board determination that the Individual Defendants intentionally engaged in wrongdoing." (SPA-54 (internal quotation marks omitted)). There is no similar allegation here.

quarterly practice of giving concessions" to distributors to improperly gin up sales. (Br. at 36). This is problematic. As Magistrate Judge Dunst noted, "the plain language of the PSLRA, which requires facts supporting the scienter inference to be stated with particularity, would seem to limit the force of general allegations about core company operations." (JA-1023 (citations omitted)). Whatever this doctrine's vitality, it is irrelevant here because, even giving Appellants "the benefit of the assumption" that the doctrine remains valid and is properly invoked on these allegations, it could not alone remedy the failure of the SAC to separately raise an inference of scienter as it is "not an independent basis of scienter." (SPA-56–57 (citations omitted)). Appellants admit that the "core operations doctrine," to the extent it is even valid, only can be used as "support for but not an independent basis of scienter." (Br. at 36).

Furthermore, "core business allegations are not evidence of scienter unless the 'magnitude' of fraud is 'startling' in relation to core products." (JA-171 (quoting *Salix*, 2016 WL 1629341, at *16)). Here, Hain's revisions were between 1.9 and 2.9 percent of total net sales on an annual basis. There was—and is—nothing "startling" about those numbers. Indeed, as held below (again) "Hain's alleged misrepresentations do not even remotely approach [the] magnitude" necessary to support scienter. (JA-1027).

### 5. Hain's Sales to UNFI Do Not Support Scienter

Appellants similarly but separately argue in four sentences that the "magnitude of the alleged fraud" carries the day for them, focusing on sales to UNFI (a distributor). (Br. at 37–38). But the cases they cite make plain that even much more sizable "magnitudes" will not alone suffice. If there are no other legitimate allegations to bolster, the size of the "fraud" alone is not enough. *In re Bristol-Myers Squibb Co. CVR Sec. Litig.*, 658 F. Supp. 3d 220, 231 (S.D.N.Y. 2023) ("the size of the fraud alone does not create an inference of scienter"); *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 517 (S.D.N.Y. 2011) (same). Appellants' argument that the volume of Hain's sales to UNFI support scienter (Br. at 37) merely parrots the "core operations" argument and leads to the same result.

Appellants' different flavors of "startling" arguments are undermined by their reliance on *Salix* and *Gauquie*. (Br. at 37–38). In *Salix*, the court considered a true "channel stuffing" case, involving a scheme to "increase levels of wholesaler inventory vastly beyond [retailer] demand," resulting in wholesalers accumulating "more than three times" customary inventory levels. Defendants there (who knew about this tripling of inventory) made public statements that inventory levels were at or near the typical level of 10-to-12 weeks when they were actually at nine months. 2016 WL 1629341, at *2, *4–8. In holding that scienter was adequately pled, the

*Salix* court relied largely on statements by individual defendants acknowledging that they had "knowledge of precise inventory levels." 2016 WL 129341, at \*14. The Court then held that these sufficient allegations of scienter were "buttressed" by the magnitude of the fraud, while recognizing that a plaintiff "cannot plead scienter based ***solely*** on the magnitude of the fraud." 2016 WL 1629341, at \*16 (original emphasis). That was deemed appropriate in that case because the fraud at issue was "startling"—constituting a tripling of inventory levels and "a \$500 million diminution in revenue compared to previous projections," a decrease of roughly 12.5 percent in 2014 alone. 2016 WL 1629341, at \*16. This is truly "startling" in magnitude—and underscores why *Salix* provides no help to Appellants. *Gauquie* likewise involved startling numbers, amounting to 40 to 50 percent of product sales. *Gauquie v. Albany Molecular Res., Inc.*, 2016 WL 4007591, at \*3 (E.D.N.Y. 2016).

The contrast to Hain is stark. Again, as the SEC found, the "vast majority" of Hain products (over 99 percent) "ultimately sold through to retailers." (JA-361–62). Hain made adjustments to net sales in the amount of 2.9 percent or less. (JA-233 ¶ 148). These numbers are far from the "startling" magnitude of the alleged fraud in *Salix* or *Gauquie* that at most might have "buttressed" the already sufficient scienter alleged in those cases.

### 6. Hain's Remedial Measures Do Not Support Scienter

Appellants argue that Hain's remedial measures (including identifying, self-disclosing, and addressing the accounting issues) should be held against it and treated as evidence supporting a finding of scienter. (Br. at 38). Despite the single case (from California) cited by Appellants (Br. at 38), that is not the law. Much to the contrary (and unsurprisingly), remedial measures ***undercut*** scienter allegations. *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 777 (2d Cir. 2010) (ordering an investigation was a prudent course of action that weakens rather than strengthens an inference of scienter); *accord Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 816 (S.D.N.Y. 2018) (self-reporting suggests good faith contrary to scienter allegations). Hain's decision to immediately alert its auditors, self-report to the SEC, and publicly disclose its concerns further negates scienter. (JA-1017; JA-916–17). Additionally, Hain's financial statements had been audited from 2013 through 2016 by Ernst & Young, which provided unqualified opinions every year (*see* JA-860), which further negates scienter. *See In re Iconix Brand Grp., Inc.*, 2017 WL 4898228, at *19 (S.D.N.Y. 2017) (scienter "undermined" by regular audits by reputable accounting firm; "fact that BDO did not detect [any improprieties] is significant").

### C. The District Court Expressly Considered the Scienter Allegations Holistically

Finally on the scienter point, Appellants wrongly assert that the District Court did not assess the scienter allegations collectively. (Br. at 46). Magistrate Judge

Dunst expressly "consider[ed] whether the allegations and other proper sources of facts give rise to a strong inference of scienter when taken *collectively*." (JA-1024 (internal quotation marks omitted) (emphasis added)). He did so in a section with the heading "Collective Evaluation," in response to this Court's specific direction. The District Court "adopt[ed] the legal standards stated by Magistrate Judge Dunst in his Report" and found his "scienter-related recommendations to be thorough and well-reasoned." (SPA-5 n.5, SPA-60).

The District Court considered each scienter argument individually and then expressly considered the individual allegations collectively. (SPA-45–58). Judge Seybert could not have been clearer about this, actually introducing her 14-page discussion of scienter by quoting the instructions of this Court that Appellants claim she ignored:

> in light of the Second Circuit's mandate that "[o]n remand, the district court should independently reassess the sufficiency of the scienter allegations, considering the cumulative effects of the circumstantial allegations of intent together with the pleaded facts relating to motive and opportunity," herein the Court focuses on Magistrate Judge Dunst's scienter recommendations.

(SPA-46 (quoting *Hain*, 20 F.4th at 138)). Judge Seybert not only explicitly quoted this Court and analyzed the SAC in accordance with this Court's direction on remand, she observed that following this Court's directions on remand also "is

39

precisely what the Magistrate Judge has done." (SPA-46). The result of those efforts was, and should be, dismissal with prejudice.

Of course, the command to consider scienter allegations collectively does not permit Appellants "to combine inadequate allegations of motive with inadequate allegations of recklessness to demonstrate scienter." *In re Diebold Nixdorf, Inc., Sec. Litig.*, 2021 WL 1226627, at \*15. "After all, zero plus zero (plus zero plus zero plus zero) cannot equal one." 2021 WL 1226627, at \*15 (internal quotation marks omitted). As a result, as is common practice, the District Court here reviewed each of the allegations of scienter to determine their merit, and then addressed any well-pled allegations identified collectively, all "in light of the Second Circuit's mandate [to] consider[] the cumulative effect" of the intent/recklessness allegations and the motive/opportunity allegations. (SPA-45–46).

In particular, the R&R concluded in its "Collective Evaluation" section (which was headed as Section 3, following Section 1's discussion of "Motive and Opportunity" and Section 2's discussion of "Conscious Misbehavior or Recklessness") that when it came to the scienter allegations "taken collectively":

> At most, and **taken as a whole**, the SAC shows that the Individual Defendants signed Class Period SOX certifications regarding the sufficiency of Hain's internal controls but, after the Company undertook an accounting review and self-reported that review to the SEC, Hain admitted in the post-Class Period SEC Order that its internal controls were deficient.

40

(JA-1024 (emphasis added)).[9] After "viewing the scienter allegations *collectively*" the R&R determined that any reasonable inference of scienter was "far less compelling than an inference of, at most, non-actionable mismanagement and negligence." (JA-1024 (emphasis added)).

Judge Seybert correctly adopted the R&R's recommendations, marking the fourth time a court has found that the scienter allegations failed. There can be no serious argument that Magistrate Judge Dunst and Judge Seybert at least did so absolutely mindful of "this Court's precise directive" (Br. at 46) to do so "holistically." That the Appellants continue to argue that Judges Dunst and Seybert failed to weigh the allegations holistically and collectively—in the teeth of this Court's unambiguous and express instructions to do precisely that and their explicit statements that they followed that instruction (which they quoted!)—strains credulity. This Court should affirm.

## II. THE DISTRICT COURT CORRECTLY FOUND THERE CAN BE NO CONTROL PERSON LIABILITY

As found below (SPA-58; JA-1027), because there is no primary violation, there can be no control person liability. *See, e.g.*, *SRM Glob. Master Fund Ltd. P'ship v. Bear Stearns Cos.*, 829 F.3d 173, 177 (2d Cir. 2016).

---

[9] While Appellants wrongly claim that the internal controls allegations support scienter (Br. at 28–31), they do not dispute the R&R's finding that the mere signing of a SOX certification is insufficient to support scienter. (JA-1016).

## III. THE DISTRICT COURT CORRECTLY FOUND THAT THIS ACTION SHOULD BE DISMISSED WITH PREJUDICE

The Court below dismissed the SAC with prejudice, noting the passage of time (including the then-more-than-six-years since the filing of the case), the previous amendments, and that since this Court's remand "Plaintiffs have neither sought leave to further amend the SAC nor communicated that they possess facts that would bolster it." (SPA-59). Declining to permit yet another speculative bite at the apple (the fourth) concerning events from 11 years ago on this record was well within Judge Seybert's discretion under the governing law.

A district court may dismiss a case with prejudice, and thus bar a plaintiff from amending a Complaint, "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007). This Court reviews a district court's decision to deny leave to amend for abuse of that discretion. *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 490 (2d Cir. 2011).

A district court does not exceed its discretion where, as here, it determines that plaintiff seeks leave to amend "after an inordinate delay, no satisfactory explanation is offered for the delay, and the amendment would prejudice other parties." *Grace v. Rosenstock*, 228 F.3d 40, 53–54 (2d Cir. 2000) (internal quotations omitted). This is especially so where, as here, Appellants already have amended (here twice). *See, e.g.*, *Garland v. New York City Fire Dep't*, 2024 WL

42

445001, at *5 (2d Cir. 2024) (affirming dismissal with prejudice where the plaintiffs already had one opportunity to amend their complaint) (citing *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 188 (2d Cir. 2014)). This Court's decision in *City of Pontiac* is instructive. There the Court affirmed the denial of leave to amend when the "[p]laintiffs already had one opportunity to amend their complaint," it was "unlikely that the deficiencies raised with respect to the Amended Complaint were unforeseen by the plaintiffs when they amended," and the "plaintiffs have identified no additional facts or legal theories—either on appeal or to the District Court—they might assert if given leave to amend." 752 F.3d at 188. So too here.

During the more than six years before the Order appealed from, Appellants had numerous opportunities to bolster their allegations. The original complaints were filed on August 17, 2016 (almost eight years ago). The District Court allowed Appellants to amend these initial pleadings, and Appellants filed the CCAC in 2017. Then, when Judge Spatt dismissed that CCAC, because "Plaintiffs "represent[ed] they have acquired information from additional" CWs and requested leave to amend," he let them amend again. (JA-178). Appellants then filed the SAC in May 2019 purportedly after their "investigation" (and after the SEC concluded its investigation and released its Order). Since then, Appellants have not sought to amend until they filed their objections to the R&R in December 2022. (*See* JA-

1028).  Appellants did not seek leave to amend after this Court remanded the case in 2021 and said nothing about amending their Complaint in the briefing before Magistrate Judge Dunst.  The SAC has thus been the operative complaint since May 2019—over five years ago.

Only after Magistrate Judge Dunst recommended dismissal of the SAC did Appellants ask Judge Seybert to permit amendment.  Appellants claimed that the R&R "did not . . . deem amendment futile" but found only that the litigation "has been pending too long."  (SPA-34, SPA-58–59).  This is inaccurate.  As an initial matter, courts of course can deny leave to amend for "undue delay," particularly where, as here, a party has had ample opportunity.  Still, the District Court found Magistrate Judge Dunst's recommendation to be based on a finding of "futility" because Appellants "had numerous opportunities to plead a case to survive dismissal" but still, to this day—roughly eight years since this lawsuit started— Appellants have not provided "any new facts that would rectify the deficiencies of their pleadings."  (SPA-59).  This is precisely why the District Court recognized that amendment would be futile.

Appellants now contend, relying on this Court's decision in *Loreley Financing*, that they are not required to provide ***any*** facts they plan to add to an amended Complaint when requesting leave to replead.  (Br. at 49).  But this Court acknowledged in *Loreley* that "[d]enial of leave might be proper . . . where 'the

44

request gives no clue as to how the complaint's defects would be cured.'" *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190–91 (2d Cir. 2015) (quoting *Porat v. Lincoln Towers Cmty. Ass'n*, 464 F.3d 274, 276 (2d Cir. 2006)). This Court has repeatedly relied on such silence (or tactical decision to "give[] no clue"). *See City of Pontiac*, 752 F.3d at 188; *Porat*, 464 F.3d at 276 ("A counseled plaintiff is not necessarily entitled to a remand for repleading whenever he has indicated a desire to amend his complaint, notwithstanding the failure . . . to make a showing that the complaint's defects can be cured."); *Paleja v. KP NY Operations LLC*, 2022 WL 364007, at *2 (2d Cir. 2022) (affirming denial of leave for "fourth opportunity to plead" [as would be the case here] where the plaintiff did not provide "any explanation of *how*" they would "cure the substantive deficiencies") (emphasis in original)).

Appellants sort of suggest that they would amend the SAC with completely unspecified information from "transcripts from depositions taken in the SEC's investigation," which concluded in 2018 (although they do not state this explicitly). (Br. at 49). Appellants do not provide "any explanation of *how*" those transcripts will cure the SAC's defects. As this Court has made clear, such silence can properly support a dismissal with prejudice. *See City of Pontiac*, 752 F.3d at 188; *Paleja*, 2022 WL 364007, at *2; *accord Bd. of Trustees of City of Ft. Lauderdale Gen. Emps.' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 883 (S.D.N.Y. 2011) ("A

party seeking leave to amend must provide some indication of the substance of the contemplated amendment in order to allow the Court to apply the standards governing Rule 15(a)."), *aff'd sub nom. Frederick v. Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012).

Appellants ask this Court to hold that it was an abuse of discretion for Magistrate Judge Dunst to recommend and Judge Seybert to order dismissal with prejudice so that they can try yet again to bolster their allegations in what would be their fourth Complaint focusing on events that occurred beginning in November 2013 and ending in February 2017. (*See* JA-186–87 ¶ 1). Given all that has elapsed here, and the multiple opportunities to amend already afforded Appellants, a more egregious example of "undue prejudice to the opposing party" than having Defendants-Appellees defend conduct from ***11 years ago*** in response to a ***fourth*** Complaint is hard to fathom. *See, e.g.*, *Palacio v. City of New York*, 489 F. Supp. 2d 335, 340 n.3 (S.D.N.Y. 2007) (denying leave to amend a second amended complaint due to events at issue having occurred seven years ago, among other things). This Court should affirm the dismissal with prejudice.

## IV. IN THE ALTERNATIVE, THE COURT SHOULD AFFIRM BASED ON THE HOLDING BELOW THAT THE CHALLENGED STATEMENTS ARE INACTIONABLE

The District Court concurred with Magistrate Judge Dunst's conclusion, reached after lengthy analysis, that the SAC should be dismissed on the independent

non-scienter ground that Appellants failed to plead an actionable misstatement or omission in connection with their "challenges to the Company's statements . . . for failing to disclose that Hain relied on 'unsustainable practices' to generate sales and/or that Hain lacked adequate accounting controls." (See JA-989–90, JA-997–98). Judge Seybert specifically noted that she agreed with this "threshold recommendation," although she did not specifically adopt it in her Order. (SPA-45 (noting "threshold recommendation finding that Plaintiffs have failed to plead an actionable misstatement or omission, **with which the Court concurs**") (emphasis added)).

An appellate court can affirm an order of dismissal "on any ground supported by the record." *See generally Olson v. Major League Baseball*, 29 F.4th 59, 84 (2d Cir. 2022). Thus, Appellees respectfully suggest that this Court can and should affirm the dismissal with prejudice on that alternative ground as well, for the reasons set forth below.

## A. Allegations Related to "Unsustainable" Practices Fail

Magistrate Judge Dunst discussed the "unsustainable sales practices" alleged in the SAC as a whole, considering both the alleged absolute right of return and the other kinds of alleged sales practices, including "sales incentives and promotions," and held that as to all of them "the SAC fails to plead that any statements are actionable by failing to disclose these practices." (JA-998). He then discussed the

absolute right of return and the other sales incentives in two separate subsections. (JA-1014–16).

### 1. The SAC Fails to Plead an Absolute Right of Return that Generated Sales as Alleged

The SAC alleges that "Hain drove sales by granting distributors a right to return Excess Inventory, [which] increased the deficit between Hain's actual and reported sales each financial quarter, and . . . rendered public statements materially false or misleading." (JA-998). Magistrate Judge Dunst found that "Plaintiffs rely on CWs for these claims" but that "the SAC's allegations on this point are too conclusory and/or vague to sufficiently plead that Hain generated sales by relying on such a right of return." (JA-998–99 (allegations fail to show that "Hain relied on the right of return as alleged in the SAC"); *see also* SPA-57 ("the CWs' allegations are too vague, speculative, and conclusory" to support scienter)).

In finding that the CW allegations did not support falsity, Magistrate Judge Dunst set forth illustrative examples of why these allegations were too vague and conclusory under the heightened standards of Rule 9(b) and the PSLRA. (*See* JA-999). For example, CW 3 observed vaguely (without any supporting detail) that he "constantly" saw product being returned. CW 4 offered his subjective belief (without any supporting detail) "that he 'knew' unspecified quarter-end transactions 'could not be real.'" Similarly, CW 7 spoke generally about "an agreement [Hain had] with its [unspecified] customers" pursuant to which those unnamed customers

"could return the unsold inventory." Yet CW 7 says nothing about the rules governing any attempted return, any actual returns, or the volume of any returns— and we know from the SEC Order that ***99 percent*** of the complained-of shipments actually "sold through" to retailers (JA-361), perhaps explaining the vagueness of the SAC's allegations regarding returns that the Court below found fatal to the element of falsity.

Indeed, to the extent any of the CW allegations attempt any specificity on this issue, the attempt undermines Appellants' point. The SAC does allege that CW 6 "recalled" that he processed $500,000 or maybe even $700,000 in returns during a given quarter. (JA-211). But, as Magistrate Judge Dunst noted, that says nothing about "whether those figures represent abnormal or substantial returns for Hain." (JA-999 n.17). Indeed, those quarterly figures would represent only between 0.08% and 0.09% of net sales at the low end (note the zeroes after the decimal point) and only 0.1% at the high end. (JA-999 n.17). Such *de minimus* impact of the supposed returns undercuts the SAC's allegations on the right of return and, together with the other conclusory and generic allegations, fails to raise a plausible inference that Hain's public statements "omitted a fact, much less a ***material*** fact, that required

disclosure" about a right of return. *See In re Coty Inc. Sec. Litig.*, 2016 WL 1271065 at *6 (quoted in JA-999 (emphasis in original)).[10]

### 2. The SAC Fails to Plead that Sales Incentives and Promotions to Generate Sales Were Not Disclosed

The SAC itself reveals that Hain regularly disclosed the unremarkable fact that it (presumably like most producers of items ultimately aimed at retail grocery purchasers) offered a variety of promotions, discounts, and other sales incentives to its distributor customers. (*See, e.g.*, JA-273–74). Indeed, not only were Hain's discounts and other incentives disclosed in its public SEC filings, these filings also made explicit that Hain's sales were reported "net of those incentives" and Appellants expressly "concede that . . . the Company disclosed its use of these sales incentives and specified that its reported sales figures were net of those incentives." (JA-1000–01).

The irony here (given their theory) is that Appellants also conceded, as they must, that "if Defendants had simply told the market at the time they disclosed Hain's financial results that Hain had engaged in these business practices in order to make its numbers, there would have been no deception and no fraud." (JA-1000).

---

[10] Appellants also point to Hain's so-called "spoils coverage" as part of their argument on returns. But as with other similar allegations, Magistrate Judge Dunst correctly found that the SEC Order undermines this theory. (JA-1000 n.18 ("explaining that the spoils coverage Hain provided to Distributor 1 amounted to less than 1% of net sales")).

But "that is precisely what Hain did with respect to sales incentives and promotions." (JA-1000).

As discussed *supra* at 20–21, Hain **disclosed** the challenged sales practices. Disclosures vitiate the viability of any 10b-5 claim. *See In re AIG Advisor Grp. Sec. Litig.*, 309 F. App'x 495, 498 (2d Cir. 2009) ("The websites therefore disclosed the existence of the very 'conflict of interest' at the heart of plaintiffs' complaint, barring any claim based thereon."); *accord In re Bank of Am. AIG Disclosure Sec. Litig.*, 566 F. App'x 93, 94 (2d Cir. 2014). The SAC also conceded that "investors were aware that distributors seemingly had too much inventory." (JA-168; *see* JA-258–70 ¶¶ 254, 263, 278, 281, 286, 288, 291). Accordingly, Appellants' omission claim relating to the Company's sales practices fail because of the disclosures made.

Appellants claim that Hain's disclosures allegedly lacked the "intensity and credibility sufficient to counter-balance effectively any misleading information created by the alleged misstatements." (Br. at 53 (citing *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 167 (2d Cir. 2000)). This argument should fail as it did below. The District Court properly observed that Hain's "alleged lack of intensity and credibility regarding its disclosure of incentives and promotions is unavailing, especially since this is not a case of 'affirmative misstatements' requiring intense correction." (SPA-43). In *Ganino*, "intense and credible" corrections were needed to counter-balance affirmative misleading information that the company "had been

compensated" for guarantees and financial reports in one year rather than another. 228 F.3d at 168. In contrast, Hain disclosed the exact practices at issue here, including promotion incentives, trade discounts and promotions, cash discounts, and coupons. (*See* SPA-9). Appellants make no claim that these disclosures themselves were misleading. Nor could they. These statements unambiguously disclose the very incentives that are at the "heart of plaintiff's complaint." *See In re AIG Advisor Grp. Sec. Litig.*, 309 F. App'x at 498.[11] Judge Seybert aptly summed it up:

> [T]here can be no failure-to-disclose claim because the Company did disclose. . . . Magistrate Judge Dunst was correct in finding Hain openly disclosed its sales and incentives practices.

(SPA-43–44).

## B. The Statements Regarding Accounting Controls Are Not Actionable

The SAC also alleges that Hain's statements concerning its accounting policies "were materially false and misleading when made and omitted material information." (*See, e.g.*, JA-271). Magistrate Judge Dunst correctly held that Hain's statements concerning its accounting policies are nonactionable opinions and that the SEC Order rebuts any inference of intentional misstatement. (JA-1002–05);

---

[11] Although Appellants merely reference in passing the "truth-on-the-market defense" they made below (Br. at 53), Magistrate Judge Dunst properly found that "[e]ven at the pleading stage, dismissal is appropriate where the complaint is premised on the nondisclosure of information that was actually disclosed." (JA-1001 n.19).

*see also Lachman v. Revlon, Inc.*, 487 F. Supp. 3d 111, 134 (E.D.N.Y. 2020) (finding SOX certifications to be statements of opinion). An opinion statement is actionable "only if it (i) contains an affirmative 'factual and falsifiable statement' alleged to be false or (2) 'implies facts or the absence of contrary facts, ***and*** the speaker knows or reasonably should know of different material facts that were omitted.'" (JA-1003 (citing *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 175 (2d Cir. 2020)). The speaker must actually "disbelieve[] the opinion at the time it was made." *Abramson*, 965 F.3d at 175.

Appellants claim that these statements regarding accounting policies were actionable because "numerous allegations from former employees, combined with the SEC's findings, sufficiently establish that the SOX Statements were materially false and misleading, and that Defendants possessed the sufficient level of scienter." (Br. at 60). These claims were properly rejected by the District Court and should be rejected here.

First, the SEC Order takes no issue with the SOX Statements that management reviewed Hain's internal controls and concluded that the controls were effective. (JA-1003). Thus, Appellants' argument that the SEC Order establishes a "factual and falsifiable" affirmative statement is unavailing. Second, as discussed above, the SAC's CW allegations are too general and conclusory to support Appellants' position. (*See supra* at 23–28).

Appellants fail to address the principle of law that a "post-Class Period identification of control deficiencies" is insufficient to show that the Individual Defendants knew *at the time* they signed their certification of any deficiencies in the Company's internal controls. (JA-1004 (collecting cases)). As Magistrate Judge Dunst observed, the SEC Order does not "indicate that Defendants knew or reasonably should have known of different material facts about the Company's internal controls contemporaneously with the SOX Statements." (JA-1003–04 (citations omitted)). As discussed above, the SEC Order diminishes the plausibility of the SAC's allegations and actually exculpates Defendants in this matter. (*See, e.g.*, SPA-52).[12]

Appellants suggest that "Hain's reliance on [the alleged] sales practices to meet projections" is comparable to the company in *Meyer v. Jinkosolar Holdings* discussing environmental issues without disclosing a report detailing "existing problems" concerning the company's disposal of hazardous waste and compliance with environmental standards that rendered false the company's disclosures. (Br. at 50 (citing *Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250 (2d Cir. 2014)). Appellants similarly cite to *Pennsylvania Public School Employees*, where the individual defendants "were made aware of these potential liabilities by various

---

[12] That Ernst & Young provided unqualified opinions on Hain's financial statements every year from 2013 through 2016 similarly diminishes the plausibility of the SAC's allegations. (*See* JA-860).

demand letters" but then "failed to disclose such potential liabilities" in violation of GAAP. (Br. at 56–57 (citing *Pa. Pub. Sch. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 939 F. Supp. 2d 445, 453 (S.D.N.Y. 2013)). Here, unlike those cases, there is no similar allegation that any of the Individual Defendants possessed similar information demonstrating they knowingly made materially misleading statements. In any event, Hain concededly ***disclosed*** to the market the promotional incentives at issue, such as discounts, promotions, and cash discounts. (*See* SPA-9, SPA-42–43). These disclosures "specifically addressed the very risks" that Appellants allege Hain did not disclose. *See Gluck*, 657 F. Supp. 3d at 490; *In re AIG Advisor Grp. Sec. Litig.*, 309 F. App'x at 498. Even if Appellants established that Hain's practices were "unsustainable" (which they have not), that Hain did not "label the sales incentives and promotions as 'unsustainable' is of no moment." (JA-1001 (citing *Dalberth v. Xerox Corp.*, 766 F.3d 172, 186–87 (2d Cir. 2014) ("Corporations are not required to phrase disclosures in pejorative terms."))).

## C. Appellants Abandoned Claims Concerning Hain's Financial Results and Related Accounting Practices

Appellants inappropriately attempt to resurrect claims that the R&R found abandoned related to "Hain's financial results, the reported methods of calculating them, their compliance with SOX, and their compliance with GAAP." (Br. at 55–56 (citing JA-989–90)). A plaintiff abandons a claim when it fails to address defendants' arguments for dismissal. *See Doubleline Capital LP v. Odebrecht Fin.*,

*Ltd.*, 323 F. Supp. 3d 393, 449 (S.D.N.Y. 2018) (collecting cases). That is precisely what happened here.

As recounted by Magistrate Judge Dunst, in opposing the motion to dismiss Appellants said nothing about "literal falsity" and did not challenge the financial numbers themselves. As Magistrate Judge Dunst rightly observed, Appellants themselves took the position that the SAC "challenge[d] as materially omissive not the financial figures but instead the failure to disclose Hain's 'reliance on pull-in sales tactics to generate sales' as the force that generated those figures." (JA-989 (quoting Appellants' own Pleading)). Appellants cannot now run from their own position.

Still, as argued below, even if Appellants had not abandoned such a claim, any claim of literal falsity based on the mere revision or GAAP violation would fail on scienter grounds. *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d at 565; *Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 414 (S.D.N.Y. 2007).

## V. ADDITIONAL ISSUES NOT REACHED BY THE DISTRICT COURT WARRANT DISMISSAL

This Court can and should affirm the Order of dismissal with prejudice based on the holdings below discussed at length in the foregoing sections. The Court also has the authority, should it choose to exercise it, to reach other grounds for dismissal briefed below but not analyzed by the District Court. *See generally Olson*, 29 F.4th at 84. This Court could affirm dismissal here on the grounds Appellees argued below

that (1) Appellants premise potential liability on statements concerning "strong demand" that are inactionable puffery (JA-800, JA-872–73); (2) *Boca Raton* and other Second Circuit decisions compel the conclusion that Appellants' allegations concerning "unsustainable practices" are not actionable as a matter of law (JA-799–801, JA-837–40); (3) materiality (JA-807, JA-872); and (4) loss causation (JA-807, JA-828).

## CONCLUSION

For the foregoing reasons, this Court should affirm the District Court's dismissal of the SAC with prejudice.

Dated:  May 13, 2024
      New York, New York

Respectfully submitted,

*/s/ John M. Hillebrecht*
**DLA PIPER LLP (US)**
John M. Hillebrecht
Marc A. Silverman
1251 Avenue of the Americas
New York, NY 10020
212.335.4500
john.hillebrecht@us.dlapiper.com
marc.silverman@us.dlapiper.com

*Attorneys for Defendants-Appellees*

57

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Second Circuit Local Rule 32.1(a)(4) because this brief contains 13,581 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14 point Times New Roman font.

Dated: May 13, 2024
      New York, New York

*/s/ John M. Hillebrecht*
John M. Hillebrecht
Marc A. Silverman
**DLA PIPER LLP (US)**
*Attorneys for Defendants-Appellees*
1251 Avenue of the Americas
New York, NY 10020
212.335.4500
john.hillebrecht@us.dlapiper.com
marc.silverman@us.dlapiper.com